### In re MARDEN'S ESTATE.

No. 73-2434.

Circuit Court, Dade County, Probate Division.

August 2, 1976.

---

Heller & Kaplan, Miami, for the claimant.

Frates, Floyd, Pearson, Stewart, Richman & Greer, Miami, and Ferrero, Middlebrooks & Houston, Fort Lauderdale, for the estate.

JOSEPH NESBITT, Circuit Judge.

This cause came to be heard pursuant to notice upon timely election to take dower filed herein by Alma Marden a/k/a Alma Slocum DuPuy and objection thereto filed by the estate of Ben Marden, deceased, and counsel for the respective parties being present and heard thereon and the court having heard the testimony and evidence presented, and considered the summation of counsel and memoranda of law and supplement thereto presented by counsel for the respective parties, and being otherwise fully advised in the premises, makes the following findings of fact —

## FINDINGS OF FACT

In this order, the claimant, Alma Marden a/k/a Alma Slocum DuPuy will be referred to as Alma or claimant. The estate of Ben Marden, deceased, will be referred to as the estate or Ben.

Alma and Ben met in New York City in 1944 at which time they were married to other parties. Shortly thereafter, they commenced a meretricious relationship. Alma was divorced in 1954. In that proceeding she became the beneficiary of two trusts; one vested in her completely and the other was terminable upon condition of her re-marriage. Alma has continued to receive the proceeds from the conditional trust from its inception and throughout these proceedings.

By reason of his wealth and due to his previous ownership in the Riviera Club in New Jersey, Ben was a person of considerable notoriety. In 1955, shortly after Alma's divorce, he gave her an engagement ring. At that time it seemed that Alma was desirous of marrying Ben but if he was interested in marriage he nonetheless successfully eluded her because of his then-existing second marriage and until the sale of the Key West property. Ben was divorced from his second wife in 1959.

Ben was a domineering and aggressive man but nonetheless he was a charming and generous individual. He was an inveterate philanderer. This undisputed fact is also established by a succession of ladies whom he courted throughout his relationship with Alma. He lavished them with gifts and remembered them in his wills, both ambulatory and final. His enduring affection, however, was for his second wife and together they continued their parental devotion to their children in their times of need. During Ben's claimed marriage to Alma, the former wife decorated two of his Miami Beach apartments.

Alma is a beautiful, charming and fascinating woman. Her first marriage was to a socialite which became her entree into the cafe society of New York and its jet set environs. Throughout her claimed marriage with Ben it is quite apparent that a substantial amount of her own private and personal life was spent in the company of her private friends where she was known almost exclusively as Alma Slocum DuPuy. She was seen and escorted by male escorts other than Ben. She maintained her private apartment in New York City and a home on Miami Beach. She took title to land and other personal property in her individual name. She was known in her own peer society by her former married name of DuPuy and was referred to as such by the press and various newspaper columnists. She made applications to social and private clubs by her former name and was admitted to membership in those

clubs as such. She maintained separate banking and savings accounts. She filed separate income tax returns. She made applications for passport and homestead exemption utilizing her former married name and indicating her status therein as either divorced or single. All of these actions which were generated by her own hand occurred during her claimed marriage to Ben and following its alleged breakup. This documentary evidence generated by Alma alone, and at a time when there was no motive to fabricate is much more credible evidence than that assumed by her present posture and testimony. In addition it is entirely consistent with the vast amount of documentary evidence also generated by Ben during a similar period of time and is consistent with his own deposition testimony admitted into evidence.

If Ben was welcome or acceptable into the cafe society where Alma pursued her own separate existence and identity, it is very clear that Ben did not care for it or enjoy that society for he seldom if ever escorted her to any of her social engagements. Alma was seen in Ben's company at fashionable restaurants, hotels and clubs and accompanied him on various trips both abroad and in this country where they registered as hubsand and wife. Undoubtedly she spent some time at his apartment in New York City in the 1960's and on various occasions enjoyed trips with him at apartments owned by him in Miami, Miami Beach and Fort Lauderdale. During various times she had some items of clothing and personal effects in his apartments. Undoubtedly Ben and Alma had a mutual affection for one another and enjoyed one another's company on isolated sojourns and trips for a considerable span of years. The manifest weight of the evidence, however, demonstrates that this relationship was sporadic, intermittent and infrequent. An overview of the evidence demonstrates a lack of continuity and completeness to establish a common-law marriage by cohabitation and repute. From the great mass of evidence produced in rebuttal by the estate showing the separate identities and separate pursuits of their individual lives, it is apparent that neither Alma nor Ben had any real intention of sealing or completing an actual common-law marriage with the other. The evidence is simply to the contrary. In rebuttal, Alma concedes her own separate, independent existence from that of Ben but sought to avoid the impact of it by claiming that it was Ben who entreated her to shun publicity, avoid senseless mail and other trivial matters and for this reason only she maintained her separate identity and at his request in order to protect him. If this were true, then over the years of their relationship there would be some vital and indelible clue but there is none. It is incredible to suppose that Alma or Ben would not recognize one another in times of great personal

stress as for instance when they were admitted to hospitals or when Alma gave a police record when she was mugged in New Jersey. There are only two occasions[1] where Ben referred to Alma as his wife at a time when there was no motivation for him to fabricate but both of these occasions occurred in Florida and after the Florida legislature had prohibited common-law marriages. It is incredible to suppose that a mature, sophisticated person would continue to file applications under oath to enjoy a particular status like obtaining a passport, homestead exemption or filing an income tax return. There is nothing protective about perjuring oneself.

Alma claims that a common-law marriage was contracted with Ben on Februry 29, 1960 in New York City which marriage was thereafter celebrated by a round-the-world tour. Countess De Morelos and Ruth Mytton, long-time personal friends of Alma were offered to prove the re-publication of this marriage, both in Paris and at the Mona Lisa Room of the Eden Roc Hotel following the cruise. Each of these witnesses knew of Alma's relationship with Ben over the span of many years. After the alleged marriage was announced in their presence, however, they failed to inquire at any time as to where the marriage took place, who performed the marriage or otherwise inquire as to how Alma finally managed to get this irresistible prize to the altar. Consequently when their testimony is gauged by human knowledge, reason, insight and judgment it falls short of credibility.

Ben's brother was offered to prove the re-publication or holding out of the common-law marriage in Florida. It is clear, however, that this brother hated Ben likely because of the animosity generated in a lawsuit prior to Ben's death.

There is some evidence of a marriage by cohabitation and repute in Florida. The only direct statements attributable to Ben are either incredible or occurred after Florida had prohibited common-law marriages from occurring. There is evidence of divided repute both in Florida and New York which is strong and persuasive. The evidence of this divided repute emanates as strongly from Alma as it does from any other source. It is true that she has used the name Marden but there is a strong tendency for this usage to have occurred after common-law marriages were prohibited in Florida or after their "breakup" and is therefore self-serving. Her use of the name DuPuy is not sufficientlty explained away by her stage career since she reported taxable earnings from acting in only one year.

---

[1]Execution of the so-called "Carriage House Lease" is largely impeached or explained away by Alma's deposition.

Undoubtedly Alma had high hopes of marrying Ben in the 1950's and Ben placated that desire by giving her a ring and putting her off because of his then-existing marriage and his other business commitments. Alma's tiff with Ben apparently did not have the psychological effect that she had desired. She took him back on the same footing they had enjoyed for years because by that point in her life Alma needed the financial freedom which her relationship with Ben provided in order for her to live separately as she was accustomed. This arrangement was very convenient for Ben because it afforded him the opportunity he needed to philander with his other ladies. On this record, the court can only conclude that Alma was one of the many ladies that Ben sincerely enjoyed and had genuine affection for over a number of years but there was never any present intent for either to be married to the other. This case can be paraphrased in one line and typically comes from Alma, where she stated to Ben's long-time friend, Judge Marovitz, "I know he'll never marry me — but he needs me."

In a case such as this the most reliable and credible index which aims unerringly to the truth is the great mass of documentary evidence generated by the parties themselves. In particular, those documents executed by the claimant herself through the years convincingly evince a lack of present intent or assent to contract a marriage, either *per verba de praesenti* or by cohabitation and repute. The decedent's own documentary testimony is consistent with his own deposition testimony and the strong evidence of divided repute which has been presented on behalf of the estate.

Upon the entire record, the court reaches the following —

### CONCLUSIONS OF LAW

The claimant must establish the existence of a common-law marriage on or between February 29, 1960 and January 1, 1968. The presumption of the continuance of a meretricious relationship has been dispelled and replaced by evidence of a "matrimonial relationship" and has created a presumption of valid marriage. The estate has rebutted that presumption by clear and convincing proof that there was no agreement to contract a common-law marriage *per verba de praesenti* or by cohabitation and repute. The evidence is clear and convincing that neither of the parties and in particular the claimant ever evinced an intention or present assent or the necessary mutuality to contract a marriage by agreement, assent or conduct, either in the state of Florida or in the state of New York. The same evidence demonstrates that no incipient marriage from either jurisdiction was ever domesticated or ratified in the other jurisdiction. From the totality of the evi-

dence presented in this case, the court finds and concludes that it has been established by evidence that no common-law marriage existed between Alma Slocum DuPuy and Ben Marden.

## FINAL JUDGMENT

Upon the foregoing record, findings of fact and conclusions of law, it is the judgment of this court that —

1. The objection to the election to take dower filed by and on behalf of Jon Rober Marden, Jay William Marden and Gertrude M. Bacon, as personal representatives of the estate of Ben Marden, deceased be and the same is hereby sustained; and

2. That Alma Marden a/k/a Alma Slocum DuPuy take nothing by her petition for election to take dower and in respect thereto, the above personal representatives of the estate of Ben Marden, deceased, go henceforth without day; and

3. That jurisdiction of the parties hereto is retained for the purpose of taxing costs and entry of judgment therefor.

